# Wytheville

THOMAS JEFFERSON LINTON V. VIRGINIA ELECTRIC AND POWER COMPANY.

June 14, 1934.

Present, All the Justices

The opinion states the case.

*B. A. Banks* and *Kelsey & Jett,* for the plaintiff in error.

*T. Justin Moore, Williams, Loyall & Taylor* and *Archibald G. Robertson,* for the defendant in error.

EPES, J., delivered the opinion of the court.

This is an action, instituted by notice of motion for judgment, brought by Thomas Jefferson Linton against the Virginia Electric and Power Company. The purpose of the action is to recover damages for personal injury and loss of personal property which the plaintiff claims to have sustained as a result of the collision between an automobile in which he was riding and a street car owned and operated by the defendant. The collision occurred on January 16, 1931, about 7 P. M., in the city of South Norfolk.

The defendant plead the general issue and the contributory negligence of the plaintiff and of the driver of the automobile in which the plaintiff was riding. The jury returned a verdict in favor of the plaintiff for $2,000.

The defendant moved the court to set aside the verdict and grant it a new trial on the following grounds: (1) Because the verdict is contrary to the law and evidence;

(2) because the court erred in giving improper instructions and in refusing to give proper instructions asked for by the defendant; (3) because of improper remarks made to the jury by counsel for the plaintiff in his argument. The contentions made by the defendant in support of its position that the verdict is contrary to the evidence are (1) that the evidence fails to show that the defendant was guilty of any negligence which was the proximate cause of or contributed to the accident, (2) the evidence shows that the plaintiff was himself guilty of negligence which contributed to the accident and which bars his recovery, (3) the evidence shows that the driver of the automobile was guilty of negligence which was the sole proximate cause of the accident.

The order of the court setting the verdict aside reads: "The court having fully heard and considered the motion of the defendant to set aside the verdict of the jury in this case and grant it a new trial, doth sustain the same. Thereupon the court being of the opinion that there is sufficient evidence before it on which to enter judgment, it is considered by the court that the plaintiff take nothing by his suit, * * * and that the defendant recover against the said plaintiff its costs in its behalf expended."

The plaintiff below is the plaintiff in error here. He makes three assignments of error, but as the third is comprehended in the first it need not be noticed. The first and second assignments of error are as follows: (1) The court erred in sustaining defendant's motion to set aside the verdict and in setting aside the verdict and entering final judgment for the defendant. (2) The court erred in holding that the plaintiff was guilty of contributory negligence as a matter of law, and that his negligence was not an issue to have been determined by the jury.

The position taken by the defendant in error is that there was no error in the court's judgment; but that, even if this court should be of opinion that the court erred in entering judgment for the defendant, it was clearly right in setting aside the verdict because of errors made

in refusing and granting instructions, and because of the improper remarks of counsel for the plaintiff, and that the most that the plaintiff in error can be entitled to is to have the case sent back for a new trial.

The facts proven by the evidence introduced by the plaintiff and such of the evidence of the defendant as was not contradicted by or in conflict with that of the plaintiff are as follows:

This accident occurred at the intersection of Bainbridge boulevard and Holly avenue in the city of South Norfolk.

Bainbridge boulevard runs north and south. The hard surfaced portion of it is seventeen feet wide; and when we hereafter refer to Bainbridge boulevard we are to be understood as speaking of the hard surface or paved portion thereof.

Holly avenue runs east and west. East of its intersection with the boulevard it is paved for a width of twenty-seven and three-tenths feet. West of the intersection it is an unpaved road. From a point at least 200 feet north of its intersection with Holly avenue to a point about 750 feet south of its intersection with Holly avenue Bainbridge boulevard is perfectly straight. Though Bainbridge boulevard makes a slight curve some 750 feet south of Holly avenue, a person standing in the boulevard 200, or more, feet north of the intersection can see an automobile on the boulevard or a street car on the tracks along the side of it from the time it gets within a half mile of the intersection.

For a long distance south of Holly avenue a single track street car line of the Virginia Electric and Power Company runs along the west side of Bainbridge boulevard, the nearest rail being five and two-tenths feet from the western edge of the paving on the boulevard. The sides of the street car involved in this accident overhang the track from eighteen to twenty-two inches, so that as it paralleled the boulevard it came within from forty to forty-four inches of the western edge of the paving. At a point which (measuring along the line parallel to the

boulevard) is forty-seven and two-tenths feet from the center line of Holly avenue extended westward, the street car tracks begin to make a curve to cross the boulevard and turn into Holly avenue. From that point the inside rail of the tracks runs on the arc of a circle having a radius of fifty-two feet, to a point in Holly avenue twenty-eight feet east of the eastern edge of the paved portion of the boulevard; and from here the center line of the tracks runs east along the center line of Holly avenue.

Measured along the inside rail from a point at which the curve of the inside rail of the track begins it is thirty-six feet to the point at which the inside rail intersects the western line of the paving on the boulevard, and something over forty-five feet to the point at which the inside rail intersects the center line of the boulevard.

The street car tracks along the western side of the boulevard stand well above the surface of the ground until they get to a point a little over 100 feet south of the south line of Holly avenue. From that point to the point at which they intersect the western edge of the paved portion of the boulevard they are somewhat less pronouncedly above the surface of the ground. As they cross the paved portion of the boulevard and in Holly avenue they are laid flush with the paved surface of the highway.

There are no car tracks on or along either side of the boulevard north of Holly avenue. South of Holly avenue there is a pole line running along the western side of the car tracks which carries the trolley wires and electric wires. At Holly avenue the trolley wires turn and follow the car tracks; but the pole line carrying the other wires on it continues along the boulevard to the north of Holly avenue.

The photographs of this intersection show that there is a street light at the southwest corner of the intersection, but the evidence is silent as to whether it was burning at the time of the accident.

The street car involved in this accident was a double-truck car of the 2100 type. That is, it had a set of trucks

at the front and a set of trucks at the rear of the car. These trucks were so placed that the front of the car, including the fender, projects from eight to ten feet beyond the center of the front truck. The evidence does not show the overall length of the street car or the distance between the centers of the front and rear trucks.

Linton was a farmer fifty-one years of age who resided at St. Brides in Norfolk county. He did not own an automobile or know how to operate one, but his friend and neighbor, Davis Umphlett, a young man who worked on alternate days at the Ford automobile plant in or near Norfolk, owned a Ford roadster. On the afternoon preceding this accident Linton arranged with Umphlett to drive him into Norfolk the next morning to sell some pork. As this was one of his off days Umphlett agreed to do so, and did so purely as an accommodation to Linton. No consideration was promised or given directly or indirectly to Umphlett for doing so; and there is no evidence which tends to show that the trip was made by Umphlett for any purpose of his own.

On the morning of the accident Linton and Umphlett left St. Brides about ten o'clock in Umphlett's roadster. Umphlett was driving and continued to drive at all times until after the accident. They went through Portlock and South Norfolk and on to Norfolk, stopping at a number of stores in these three places. Linton told Umphlett where to go and when to stop, but he did not exercise or attempt to exercise any control over the operation or driving of the automobile. In Portlock, South Norfolk and Norfolk they went to some fifteen or twenty stores, and about 3 P. M. Linton finally succeeded in disposing of the last of his meat. At Linton's direction Umphlett then drove to Commercial Place in Norfolk where he parked his car while Linton made some purchases.

About five o'clock they left Norfolk and drove to the home of a Mr. Johnson in South Norfolk. Johnson's son, who had married Linton's daughter, was living with his father, and they drove there to get a violin which belonged

to Linton and that Linton might see his son-in-law about selling some meat for him. They got to Johnson's house about six o'clock, and stayed there about an hour.

Johnson's house is on Bainbridge boulevard, a block and a half north of its intersection with Holly avenue, but the record does not show whether it is on the east or the west side of the boulevard.

They left Johnson's house about 7 P. M. and drove southwardly along Bainbridge boulevard towards Holly avenue, en route to St. Brides. The headlights on the automobile were lighted and were sufficiently strong to enable them to see a man in the road 200 feet ahead. As they approached Holly avenue the street car with which they collided was coming north along the tracks paralleling Bainbridge boulevard. Its headlight was lighted, and the lights inside the car were burning.

They had crossed this intersection twice that day, once as they drove into Norfolk in the morning, and again as they drove from Norfolk to Johnson's home.

With reference to his knowldege of and familiarity with the crossing by the car tracks of Bainbridge boulevard Linton testified as follows:

"Q. How many times had you been over this crossing?

"A. I don't know, sir. I had not been over there in a right good while before [the day of the accident].

"Q. Did you know that there was a street crossing at this place?

"A. I knowed that there was one there, but I couldn't see it. I had been across it before, but it was a right good while ago, but I didn't have any idea that we were right on it."

Umphlett testified that he had not driven over this crossing "over three times," that he was not "familiar with that road," and that he did not know that the car turned at that point.

When questioned as to the speed at which they were driving as they approached Holly avenue, Linton testified "I don't know. Somewhere around fifteen or twenty

miles, or something like that." Umphlett said that they were driving about fifteen or twenty miles an hour. C. J. Bryant, a witness introduced by the plaintiff, testified that he was standing in front of a store on the northwest corner of this intersection and was approximately sixty feet north of the place of the collision, that when he first saw the automobile it was about half a block north of Holly avenue, and that "it was going at about thirty or thirty-five miles when I first saw it between blocks." R. L. Dillon, another witness introduced by the plaintiff, testified that he was standing on the side of Bainbridge boulevard about 105 feet north of where the collision occurred, and that when Umphlett's automobile passed him it was running "around twenty-five or thirty miles" an hour. The only evidence which tends to show that the speed of the automobile was reduced before the collision took place is the testimony of Linton that after he "hollered," when they were within eight feet of the track, "the boy, it looked to me, put the brakes on and cut the car to his left."

Neither Linton nor Umphlett testified as to the speed of the street car; but plaintiff's witness C. J. Bryant, testified that the street car was going "I judge about five or six miles" an hour as it was coming around the curve, and that "the street car was almost at a standstill when they went together. * * * the street car was practically stopped as they struck." This is all the evidence in the record with reference to the speed of the street car.

Umphlett was introduced as a witness by the plaintiff. He testified that he was driving his car on the right side of the boulevard as he approached Holly avenue; that there was no other traffic on the road; that there was nothing to prevent a person traveling as he was from seeing a street car approaching along the west side of the boulevard for half a mile; that at the speed he was driving he could have stopped his car in about the length of it, i. e., in about twelve feet; and that he had not seen the street car at all until Linton "hollered," and thereby attracted his attention to it. His testimony with reference to when

he first saw the street car and what he then did is as follows:

"Q. When was the first [time] you saw that the street car was making the turn in front of you?

"A. It was about eight feet from the curve.

"Q. Had you seen the street car prior to that time?

"A. No, sir.

\*     \*     \*     \*     \*     \*     \*     \*

"Q. How close were you to the tracks before you did see the street car?

"A. I don't know exactly.  About fifteen feet or something like that, \* \* \* ten or fifteen or something like that."

\*     \*     \*     \*     \*     \*     \*     \*

"Q. When you saw that situation, with you and the street car about \* \* \* ten or fifteen feet apart, you cut hard to your left, didn't you?

"A. Yes, sir.

"Q. And tried to get around in front of it?

"A. After I saw it was coming into me I cut.

"Q. You were not to the track then, it couldn't hit you until you got on the track?

"A. When I was ten or fifteen feet from it I didn't know it was going to turn.

"Q. What made you cut to the left?

"A. To avoid the accident.

"Q. If you didn't know it was going to turn, what made you think there would be an accident?

"A. After I saw it was going to turn, I turned to my left.

\*     \*     \*     \*     \*     \*     \*     \*

"Q. Didn't you cut to your left to try to run around in front of it?

"A. I cut to my left to get away from it.

"Q. Because you knew or didn't think you could stop; is that the reason?

"A. I didn't have time to stop when the car was right in the side of me.

"Q. So when you saw the street car you were so close

to it you didn't have time to stop before the collision took place, is that correct?

"A. Yes, sir.

"Q. And you knew unless you ran around in front of it you would crash into the side of it, didn't you?

"A. I didn't try to run around in front of it.

"Q. You cut over to the left didn't you?

"A. Yes, sir.

"Q. And the impact took place just about the center of the street didn't it?

"A. It looked like he could have stopped his car as good as I could if he saw me.

*     *     *     *     *     *     *     *

"Q. You said a minute ago that when you first saw the street car you were about ten feet from the track?

"A. Yes, sir.

"Q. At that time you thought the street car had not got to the curve?

"A. It was on the curve.

"Q. It was in the curve, wasn't it?

"A. Getting ready to turn.

"Q. It was already turning, wasn't it?

"A. When I saw the track I cut to my left.

"Q. Wasn't the street car when you saw it, already turning?

"A. No, sir.

"Q. Did you know from the beginning of that curve to the near edge of Bainbridge boulevard is thirty-seven feet?

"A. No, sir.

"Q. And then half way across the street it is eight more feet, which would make forty-two feet when that street car first began to make that turn. You do not mean to tell the jury that that street car ran forty-two feet while you were traveling ten feet do you? That is impossible, isn't it?

"A. I guess it is.

*     *     *     *     *     *     *     *

"Q. There was nothing * * * to prevent you seeing it (the street car) that night, was there?

"A. You could see it, but I didn't know whether it was going to turn.

"Q. But you didn't see it?

"A. I saw it when it was turning into me.

\* \* \* \* \* \* \* \*

"Q. Did you know that there was a street car track right at that point?

"A. No, sir.

"Q. When did you first see that there was a street car track right at that point?

"A. When I saw the street car.

\* \* \* \* \* \* \* \*

"Q. When you saw this street car. Why was it you did not turn to your left up Holly avenue, or to your right up that dirt road, as shown in that picture?

"A. I was too close on the curve.

\* \* \* \* \* \* \* \*

"Q. If you had seen the street car when you were as much as twenty feet from the track, you could have turned to the right or to the left and have avoided the accident?

"A. Yes, sir.

"Q. Did you realize that this car was going to swing around there and swing into the side of your automobile until you were eight feet from the track?

"A. No, sir.

"Q. You did turn just as soon as you saw and realized that the car was going to swing into you?

"A. Yes, sir."

Linton testified that as they approached the intersection "I saw it (the street car) up ahead." * * * "I think it was around a block, or half a block, or something like that" from the place the collision took place. "I don't know" how far we then were from the point of impact. "Probably we were half a block, or something like that, or quarter of a block, I just couldn't say." * * * "I don't know how many feet a block is." I could see the street car 100 yards away, but I "didn't see it that far." "It

might have been fifty yards and it might have been forty yards, or something like that" from the point of impact when I first saw it. At that time "I guess we were about the same distance, and maybe might have been further," from the point of impact.

His testimony as to what took place after he first saw the street car is as follows:

"Q. How close were you to the crossing when you observed the street car was turning?

"A. About eight or ten feet.

"Q. What did you do? .

"A. * * * reared back and hollered.

"Q. What did the driver do?

"A. It looked to me like he cut his car to the left (when I hollered).

\* \* \* \* \* \* \* \*

"Q. Did you continue to look at the street car as you proceeded that forty or fifty or sixty yards (after you first saw it)?

"A. I was looking at the street car. Of course I didn't keep my eyes set right there all the time, but I could see it coming down the track.

\* \* \* \* \* \* \* \*

"Q. As you looked out the front, you kept it in view the whole time?

"A. If I had kept my eyes on it, sure.

"Q. If you were looking ahead, you were?

"A. You can look at anything and not exactly be noticing it. * * * I saw the car coming down the track, and looked at it, and then I didn't know that it was coming across the road there.

"Q. But you were looking at it practically the entire time?

"A. I saw the car coming.

\* \* \* \* \* \* \* \*

"Q. How close was he to the wreck when he started cutting to the left?

"A. About eight feet I reckon. * * * When I hollered he cut the car to the left.

\* \* \* \* \* \* \* \*

"Q. While you were traveling that forty, fifty or sixty yards looking at the street car, did you say anything to the driver about the car coming?

"A. No, sir.

"Q. Did you see the car when it started to make this turn?

"A. That is when I hollered, when the car was making that turn coming around that bend.

"Q. How far was the street car when the automobile was eight feet away?

"A. It was coming around that bend. You can judge that for yourself. I don't know how far it is. It is not very far apart.

"Q. When you were eight feet away, how many feet was the street car away? You said it was coming around the bend. It comes around the bend a good long ways. It was in the bend when you were struck?

"A. Yes, sir, but * * * when I saw the car there was not much distance between the automobile and the car. * * * The car came around the curve and swung right around the curve. * * * and swung around and hit the car about middleway.

"Q. How far was the street car from the point that you were struck when you hollered and were eight feet away?

"A. The street car had come around the curve.

"Q. Was it four, or five, or six feet?

"A. Yes, sir, six feet or eight feet, I just don't know.

\* \* \* \* \* \* \* \*

"Q. It might have been four and it might have been eight? I want your best judgment.

"A. It was coming around the curve when I first saw it. It had made the turn when I hollered.

\* \* \* \* \* \* \* \*

"Q. When this car entered the curve I believe you stated you didn't say anything to the driver at all?

"A. I didn't say nothing to the driver.  I didn't holler until I saw the car coming around there.

"Q. And that was when it was within six or eight feet of you?

"A. Something like that, yes, sir.

\*  \*  \*  \*  \*  \*  \*  \*

"Q. I believe you stated a short while ago in your direct examination that you knew the track was there?

"A. I knew the street car track was there, yes, sir.

"Q. Did you know whether or not Mr. Umphlett was familiar with the situation out there?

"A. I don't think he was.  I won't say.

"Q. You have told the jury that you saw this street car while it was proceeding down there about forty or fifty feet away until it came up and struck you?

"A. I said I saw it coming, but I was not looking directly at the car all the whole way coming in."

This case was tried on March 15 and 16, 1932.  On February 9, 1932, the case of Umphlett against the Virginia Electric and Power Company had been tried before the same judge who tried the instant case, and Linton was one of the witnesses who testified in that case.  The defendant introduced Mr. Phlegar, the stenographer who reported the evidence in Umphlett's case, who testified that on that trial Linton was asked the following questions to which he made the following replies:

"Q. As you came along the boulevard did you see this street car coming?

"A. I didn't see nothing of the street car until it was coming around that curve. That is when I noticed it. When street car was coming around the curve, is when I took notice of it.

"Q. How far was it from the point of impact at that time?

"A. About as far as here to you.

"Q. About twelve feet?

"A. Something like that.

"Q. How close were you all to the point of impact at that time?

"A. I guess we were—I don't know. The best I can remember, we were something about eight or ten feet of the track.

"Q. And that was the first time you had seen the car at all?

"A. Yes, sir.

"Q. Were you asleep?

"A. Oh, no.

"Q. Were you looking ahead?

"A. No.

"Q. What were you doing?

"A. Talking to him.

"Q. About that time Mr. Linton tried to swing to the left and run around it?

"A. It looked to me like Mr. Umphlett was trying to cut the car around.

"Q. And the accident happened almost immediately, didn't it?

"A. Yes."

The above quoted testimony given by Linton at the former trial was read to him and among other questions he was asked the following questions with reference to it.

"Q. Didn't you testify at the last trial, 'I didn't see nothing of the street car until it was coming around that curve?'

"A. I might have said it, and if I said it I didn't mean it. I mean coming around the curve. I might have said I didn't see it coming up the track, or something like that.

"Q. Which is right—what you said last time or this time?

"A. I say I saw it about half a block or a block up the road coming, and I told you I didn't notice it all the way down, and when I noticed it it was coming around the curve.

"Q. You were asked this question: 'Were you looking

ahead?' and your reply was 'No.' Didn't you testify to that last time?

"A. I don't remember.

"Q. But this time you said you were?

"A. I was looking ahead. I saw the car down the track.⸱

"Q. Don't you recall you were asked the next question, 'What were you doing' and replied 'talking to him'?

"A. You asked what I was doing and I told you I was talking to him, and you asked what I was talking about, and I said I didn't remember."

Umphlett and Linton and all the other witnesses who were questioned on the subject testified that they did not hear the motorman sound a whistle, bell or gong, or give any other audible signal of the approach of the street car; and there is no evidence in the record which tends to show that he did. However, there is no evidence that there was an ordinance which required the motorman to give a signal before making this turn; and, so far as this record discloses, his only duty in this respect was his common-law duty to use ordinary care.

The motorman was not put on the witness stand by either party; and the record is silent as to what he saw or did further than that he brought the car around the curve at from five to six miles an hour, and had almost brought it to a stop before the impact.

The only material conflict between the testimony of the evidence introduced by the plaintiff and that introduced by the defendant as to how the accident ocurred is with reference to the speed of the automobile.

The evidence introduced by the plaintiff does not fix the part of the street car which was struck by, or struck, the automobile further than that "the front" of the street car came into contact with the automobile, which was then being cut to the left. But the testimony of witness Holoman, who was introduced by the defendant, fixed the part of the street car which first came into contact with the automobile as the right front side or corner of the street car. He, in effect, describes the automobile as mov-

ing at an angle to the plane of the front of the street car and side-swiping at an angle its left front corner. This evidence is explanatory of the evidence introduced by the plaintiff and not in conflict with or contradictory of it.

All the witnesses agree that the part of the street car which came into contact with the automobile was east of the center line of the boulevard when the impact occurred, and that after the accident the automobile was sitting on the paved portion of the boulevard near its eastern edge with the street car up against it. Allowing for the width of the automobile, it could not have been pushed or shoved by the street car more than three feet after the impact. This is in accordance with the testimony of plaintiff's witness C. J. Bryant that the street car had come almost to a stop before the collision.

Taking the evidence in its most favorable light from the standpoint of the plaintiff, when the front of the street car began to swing to the right around the curve, the automobile was at least eighty-two feet from the point of the collision.

The maximum at which any of the witnesses place the speed of the street car as it entered and rounded the curve is six miles an hour. The distance from the point at which the front wheels of the street car began to turn to the point at which they were when the front of the car reached the center line of the boulevard is a little more than thirty-four feet. The only sudden swing of the street car to the right which occurred was just as its front entered the curve. From then on the movement to the right was a gradual deflection to the right as it followed a curve which was practically the segment of a circle. If the speed of the street car as it entered the curve was six miles an hour and its speed remained constant from then until the impact occurred, then the time that elapsed between the instant the front of the car began to swing to the right and the instant it crossed the center of the boulevard was not less that 3.86 seconds. The minimum at which any of the witnesses place the speed of the automobile as it

approached the place of collision is fifteen miles an hour and there is no evidence which tends to show that its speed was reduced below fifteen miles an hour until it was within eight feet of the track. Even if it be assumed that at eight feet from the track the driver of the automobile began to slow its speed down and brought it to a stop just at the instant of the impact (which the evidence shows is not a fact) it follows that when the street car began to turn to the right the. automobile was not less than eighty-two feet from the point that the nearest car track crossed the center line of the boulevard.

However, the testimony of Linton and Umphlett was not that the car was going fifteen miles an hour, but that it was traveling "fifteen or twenty" miles an hour "or something like that," while the plaintiff's witness C. J. Bryant estimates the speed to have been from thirty to thirty-five miles an hour, and his witness Dillon estimates the speed to have been twenty-five or thirty-five miles an hour. If the speed of the automobile was twenty miles an hour it must have been at least 114 feet from the nearest rail when the street car began to make the turn. If its speed was twenty-five miles its distance was at least 142 feet, and if its speed was thirty miles an hour it was at least 170 feet.

■ In the view which we take of this case it is not necessary to consider the evidence bearing upon the question of whether Umphlett or Linton was intoxicated, the instructions given and refused, or the remarks of counsel. We are of opinion that the court should have set aside the verdict and entered judgment for the defendant (1) because the evidence was, as a matter of law, insufficient to sustain a verdict finding that the defendant was guilty of any negligence, and (2) because, even if the defendant was guilty of negligence, the plaintiff himself was guilty of concurring negligence which contributed to causing the collision and barred his recovery.

■ The driver of the automobile was plainly guilty of negligence which contributed to causing the collision; but

under the facts of this case his negligence is not imputable to Linton.  Linton and the driver were not engaged in a joint enterprise; and Linton's relation to the driver was not such that he was entitled to exercise authority or control over him with reference to the matter wherein he was negligent, that is, the operation of the automobile.  While Linton was not a passenger for hire, his relation to the driver was more closely akin to that of a passenger of a taxi driver, who is an independent contractor, than it was to that of a master to his servant.

The evidence is silent as to whether the motorman was keeping a lookout.  But whether he was or was not, he can be charged only with what he saw or would have seen if he had been keeping a proper lookout.  According to the testimony given by the plaintiff himself, if the motorman was keeping a proper lookout, as he approached the curve he would have seen Umphlett's automobile some distance away approaching the intersection at from fifteen to twenty miles an hour (a comparatively slow speed).  After he had actually entered the curve and the turning movment of the street car had become readily apparent to anyone keeping a lookout, he would have seen that the automobile was still somewhere from eighty-five to 114 feet distant from the point that the nearest rail of the tracks crossed the center line of the boulevard.  At this time, so far as the record discloses, there was nothing which he would have seen which ought to have put him on guard that the driver of the automobile had not seen the street car or was unconscious that it was turning across the boulevard.  Not only does the driver Umphlett testify that at the speed he was going he could have stopped his automobile in about a car's length (that is, about twelve feet), but it is a matter of common knowledge that at such a speed an automobile can be stopped in a very short distance.  It is further a matter of common knowledge that automobile drivers ordinarily do not bring their cars to a stop at a street railway crossing when they are eighty-five feet distant.  They are accustomed

to approaching much closer before stopping. The head-light of the street car was lighted, as were the lights inside the street car, and it was necessarily a conspicuous object visible to anyone who was keeping even the most casual lookout; and the turning movement of the front of the street car was such as to make its change of direction apparent to one facing it from the instant the car began the turn.

In this situation no legal duty rested upon the motorman to give an audible signal before proceeding to make the turn, or to stop and wait until the automobile had passed over the crossing. He had a right to assume that the driver was obeying the law and keeping a lookout, had seen the street car and observed that it was turning across the boulevard, and would stop before his automobile came into dangerous proximity of the car tracks; and he was warranted in acting upon this assumption until the automobile was so close as to make it practically impossible to prevent a collision. The motorman of a street car is not charged with the duty of anticipating the negligence of the driver of an automobile and taking steps to counteract it. He is only required to take steps to avoid the results of the negligence of a driver when it has become, or should have become, apparent to him that the driver is negligent and will not or cannot take steps to protect himself or his passengers.

When a person has observed a dangerous situation of which the driver is apparently unconscious, it is his duty, if he is so situated that he can readily do so, to call the driver's attention to it; and, if he fails to do so and is injured as a result of such failure, he is guilty of negligence.

Linton's testimony is that he does not know whether Umphlett was familiar with the crossing, but that "I don't think he was;" that when the automobile was from 120 to 150 feet north of the intersection and the street car was from 120 to 150 feet south of the intersection he observed the car approaching, and continued to look as it

approached them; and that he knew there was a street car crossing at this intersection, but "I didn't have any idea that we were right on it." That is, he saw this street car approaching and not over 300 feet from him, and knew that it would cross the boulevard somewhere within that 300 feet. But notwithstanding this and the fact that he had no reason to believe that Umphlett was familiar with this crossing, he went on talking to Umphlett and did not call his attention to the approaching car, or to the fact that it would cross the boulevard before they passed it, until they had gotten within eight feet of the tracks, when he saw that a collision would take place, and "hollered."

Under the facts as disclosed by this record we are of the opinion that Linton was, as a matter of law, guilty of negligence in not having sooner warned Umphlett of the approach of the street car and the fact that it would cross the boulevard before they passed it. We think the evidence shows, as a matter of law, that the proximate cause of this accident was the negligence of the driver and the concurring negligence of his passenger, the plaintiff.

The judgment of the trial court is affirmed.

*Affirmed.*