# Richmond

ANNIE C. CALDWELL, ADMINISTRATRIX OF THE ESTATE OF
ROBERT ELVIN CALDWELL, DECEASED v. DAVID N. PARKER.

November 27, 1950.

Record No. 3711.

Present, Hudgins, C. J., and Gregory, Eggleston, Buchanan and Miller, JJ.

The opinion states the case.

*Phillips, Marshall & Blalock*, for the plaintiff in error.

*Newman & Allaun*, for the defendant in error.

MILLER, J., delivered the opinion of the court.

David N. Parker obtained a verdict and judgment for $3,250.00 against Annie C. Caldwell, administratrix of Robert Elvin Caldwell, deceased, for personal injuries and property damage resulting from a collision between an automobile he was driving and one operated by defendant's decedent.

The parties will be hereinafter referred to in accordance with their positions in the court below.

Two questions are presented by defendant's assignments of error:

(1) Was the plaintiff guilty of contributory negligence as a matter of law that bars his recovery?

(2) Was the evidence sufficient to support defendant's Instruction F so that its refusal was reversible error? This instruction would have submitted to the jury the factual issue of whether or not plaintiff was operating his automobile while under the influence of intoxicants.

Determination of these questions requires that the evidence be set out at some length.

The accident happened in Warwick county at about 10:30 p. m., June 17, 1948, on Route 351 (otherwise known as 39th Street superhighway) just west of its intersection with Chestnut Avenue. Plaintiff, who was the only occupant of his car, received serious injuries and his automobile was practically demolished. Robert Elvin Caldwell, a Virginia State Trooper, driver of the other car, was killed, and a companion trooper, Charles L. Bailey, painfully injured.

State Route 351, over which there is much traffic, is forty-four feet, six inches wide, and extends from Newport News on the west to Hampton on the east. It is divided

into four traffic lanes and is intersected at right angles by Chestnut Avenue, which extends in a northerly and southerly direction. The hard-surface of that street is twenty-seven feet, nine inches wide. Traffic at the intersection is controlled by two lights synchronized to change in unison. One is suspended over and governs the movement of traffic upon the two west-bound lanes, and the other over and governing traffic on the east-bound lanes. Eastwardly from the intersection Route No. 351 is level and straight for three-tenths of a mile at which point it gradually turns northeastwardly. Westwardly from the intersection the road is straight for a like or greater distance. On the northwest corner and situated somewhat back from Route 351, which it faces, is a filling station, food and drink establishment, called Curb Club Restaurant. A driveway entrance and exit from this tavern or restaurant enters the north side of the highway slightly west of Chestnut Avenue.

During the afternoon several hours before the accident, plaintiff and a Mr. Ferguson, who worked with him in Newport News, decided to go to Smithfield when they finished work to inspect a Frozen Food Plant. Plaintiff purchased a pint of 86 proof whiskey and they left in his automobile about 6:15 p. m. While crossing the James River Bridge at the western limits of Newport News each had a drink from the bottle and then took a second drink before they reached Smithfield. They stopped on the edge of that city at a "Drive-In" restaurant and while there saw a friend to whom was offered a drink. All three then participated in the refreshments and shortly thereafter plaintiff and Ferguson consumed what remained in the bottle. The two then left the car and entered the "Drive-In" where each had a sandwich, a cup of coffee and a bottle of beer. After that they visited and went through the Frozen Food Plant and then drove back to Newport News. Upon reaching that city, Ferguson parted company with plaintiff.

It was then about 10:00 p. m., and plaintiff drove on towards his home but on the way stopped at Curb Club

Restaurant and parked his car in the parking area of that establishment. He entered and ordered a bottle of beer, which he drank and engaged in conversation for thirty to forty-five minutes with one James Street, the proprietor, and some other acquaintances. He then departed, entered his car and undertook to proceed from the driveway into and across the north half of Route 351 to the south half thereof, with the intention of there turning more directly to his left and proceeding thence in an easterly direction towards Hampton. He says that before entering the highway and as he drove to the curb, he stopped and looked in each direction, but seeing no car, he slowly proceeded forward into the road, looked again to his left, and seeing nothing undertook to cross and turn eastwardly, which movement would bring him up to and facing the traffic light on the south side of the road. He further says that the traffic light was red for east and west bound traffic just before he entered the highway and that when he had about reached the center of the road preparatory to turning more directly east, he was violently struck by Trooper Caldwell's Ford car which was traveling westwardly. However, other evidence indicates that the light had changed from red to green when the Trooper's car approached and entered the intersection.

The testimony of Trooper Bailey was that a few moments before the accident, Trooper Caldwell set out in pursuit of a speeding car moving along Route 351 from the direction of Hampton towards Newport News, which vehicle, if it continued its course, would eventually cross Chestnut Avenue. This car, he says, was traveling at a speed of fifty miles per hour or more when first seen. It, however, seems to have probably increased that speed for in some way it eluded the troopers and they had lost sight of it before the accident actually happened. Yet the speed of the Ford car driven by Trooper Caldwell is estimated by witnesses to have been from 65 to 80 miles per hour, or possibly more, as it approached Chestnut Avenue and the scene of the

tragedy. One witness says she was first attracted by the noise of that oncoming vehicle and described what she heard and saw as follows:

"I was standing in the store just a few steps from the front door and I heard a car coming at a terrific rate of speed and I ran out to the door just before they hit across the street. I couldn't estimate the speed but I knew it was a terrific rate of speed. * * * It was just going so fast, I don't know. That's what drew my attention to it."

Another witness placed the speed of the trooper's car at sixty-five to seventy miles per hour and a third witness estimated its speed from seventy-five to eighty miles per hour. Trooper Bailey said they were traveling as fast as the Ford could go in their pursuit of the fleeing car, and Sgt. Nottingham of the State Police Force estimated the top speed of such a Ford automobile as from ninety to one hundred miles per hour. There is no evidence that the trooper had turned on the siren or the blinker light in order to warn other motorists of the danger then incident to the operation of his car on the highway at this speed. It further appears that deceased and Trooper Bailey saw plaintiff's car at the same time, as it entered and crossed the northern part of Route 351 preparatory to turning eastwardly thereon. Their automobile was then about seventy-five to one hundred yards west of Chestnut Avenue. Its speed was then so great that upon application of the brakes, it skidded that distance and on across Chestnut Avenue where it struck plaintiff's car and then rolled against and over the hood of another oncoming vehicle and then to the south side of Route 351 against the curb.

The evidence supports the finding that decedent was operating his car at a reckless speed along a busy thoroughfare—in fact, at a speed wholly unwarranted by the circumstances and which constituted a distinct hazard and menace to other travelers on the highway. The jury may well have concluded that its speed was eighty miles per hour or more. If that be true, it would have taken about eighteen seconds or

less for it to traverse the three-tenths of a mile from the curve to Chestnut Avenue where the accident occurred.

Plaintiff was obligated to exercise ordinary care to look for and heed traffic approaching along the highway that might be seen and reasonably expected to affect his intended movement. However, because he did not see this car and avoid the collision, it cannot be said as a matter of law that he failed to perform his duty in this respect. It was not incumbent upon him to insure his safe passage into and along the highway from the dangers of a speeding car that may well have been beyond the range of reasonable vision when he slowly entered the highway and yet due to its excessive speed have struck him as this car did before he reached the far side of the road. Strikingly pertinent to these facts is the language of Mr. Justice Gregory in *Angell* v. *McDaniel*, 165 Va. 1, 6, 181 S. E. 370:

"* * * Another fact ignored is that the plaintiff only was required to look down Campbell Avenue for a reasonable distance for approaching traffic. He certainly was not required to anticipate and foresee that the defendant's car would be driven into the intersection at sixty to seventy miles an hour without diminishing its speed. He stated that he looked and could see very plainly down Campbell Avenue almost to the next cross street. If he reasonably looked for a reasonable distance considering all of the surrounding circumstances he was not guilty of contributory negligence as a matter of law in driving into the intersection. At most it was a jury question. * * *"

Approval of the holding in the case of *Angell* v. *McDaniel*, *supra*, is found in the language of Mr. Justice Spratley in *Yellow Cab Co.* v. *Gulley*, 169 Va. 611, 194 S. E. 683, wherein it is said at p. 619:

"In the *Angell Case*, *supra*, the plaintiff testified that while travelling at a reasonable speed he entered an intersection of a city street, and seeing no car approaching had almost crossed the intersection before he was struck by the defendant's car, travelling at a speed of sixty to seventy miles

an hour. The evidence of the plaintiff and certain evidence of other conditions presented questions of fact for the jury to determine whether or not the plaintiff could, or ought to have seen the defendant's car, if he did look as he claimed."

Plaintiff's failure to see the oncoming car until about the moment of the impact has been reasonably and sufficiently explained. We are constrained to conclude that the evidence as a whole presented a question of fact as to whether or not plaintiff was guilty of contributory negligence. That issue having been determined by the jury, we are not permitted to disturb it.

Instruction F, which was offered by defendant and refused, is as follows:

"The Court instructs the jury that if you believe from the evidence that the plaintiff, David N. Parker, was operating his automobile, just prior to the collision, while under the influence of intoxicants to such an extent that his ability to drive with safety to himself and to others was thereby impaired, you are instructed that the plaintiff was guilty of negligence. And if you further believe that such negligence, if any, of David N. Parker was a proximate cause of the accident, or efficiently contributed thereto, you shall find your verdict for the defendant."

In addition to the facts recited bearing upon the correctness of the court's refusal to give this instruction, the evidence discloses that shortly after the accident plaintiff was carried to Riverside Hospital in Hampton, and, at the request of Sgt. Nottingham of the State Police, immediately examined by an intern and another physician to determine whether or not he was intoxicated. Their diagnosis and conclusion was that he was not. In addition to this evidence establishing his sobriety just after the mishap, the proprietor of the Curb Club Restaurant who had talked for some time with plaintiff immediately before the collision stated that he observed no indication of intoxication. To that witness, who had an opportunity to appraise plaintiff's condition, he appeared entirely normal. He said:

"There was nothing about his actions that I would thought he was drinking."

Plaintiff denied that he was affected by what he had drunk. With reference to his condition when he left the Curb Club Restaurant and got in his car, he said, "I never felt the drink anymore."

After Sgt. Nottingham had observed plaintiff in the hospital and had him examined by the physicians, he concluded not to make any charge against him for driving under the influence of intoxicants.

Reliance is placed by defendant upon the decision of *Yorke* v. *Maynard*, 173 Va. 183, 3 S. E. (2d) 366. There the question of whether or not the driver, John L. Yorke, was under the influence of intoxicants was an issue, among others, submitted to the jury. Evidence to establish that driver's lack of sobriety was amply sufficient. That is disclosed by the court's opinion approving submission of the issue.

"Yorke testified that he was not drunk but that he had taken four or five drinks and could feel the effects of them. Witness Cox testified that Yorke 'was very much intoxicated; no doubt about it in my mind.' It is needless to tell more of the evidence for that set forth is sufficient for the purpose of this opinion."

Though plaintiff had, some hours previous to the accident, partaken of intoxicants and drunk a bottle of beer just before the mishap, the record lacks any probative evidence to establish the fact that he was under the influence of intoxicants at any time shortly prior to the tragedy or when he drove his car from the Curb Club Restaurant into the highway. All of the factual proof and testimony of those in position to know is to the contrary.

"If there is no evidence that ought reasonably to satisfy the jury that the fact sought to be proved is established, then no jury question is presented." *Acme Markets* v. *Remschel*, 181 Va. 171, at p. 178, 24 S. E. (2d) 430.

That being the status and character of the proof

relied upon to support the instruction, it was properly refused. A mere possibility that one may be under the influence of intoxicants does not justify formulation and submission of that issue to the jury.

The judgment is affirmed.

*Affirmed.*