Mario **PISTOLESI**, Appellant,

v.

Joe **STATON** and Carrol Sue Dail Lucas, Appellees.

No. 72-2468.

United States Court of Appeals, Fourth Circuit.

Argued April 3, 1973.

Decided July 20, 1973.

George H. McNeal, III, Norfolk, Va. (Wolcott, Spencer, Rivers & McNeal and William A. Wheary, III, Norfolk, Va., on brief), for appellant.

John B. Preston, Virginia Beach, Va. (Preston, Preston, Wilson & Tambert, Virginia Beach, Va., on brief), for appellee Staton.

L. S. Parsons, Norfolk, Va. (Parsons, Steffan & Moore, Norfolk, Va., on brief), for appellee Lucas.

Before BOREMAN, Senior Circuit Judge, WINTER, Circuit Judge, and BLAIR, District Judge.

BOREMAN, Senior Circuit Judge:

Appellant, Mario Pistolesi (plaintiff below), brought this diversity action to recover damages for personal injuries allegedly suffered in a traffic accident. Pistolesi charged that the concurrent negligence of appellees, Joe Staton and Carrol Lucas (defendants below), was the proximate cause of that accident. The jury returned a verdict in favor of defendants Staton and Lucas, and judgment was entered thereon. Upon appeal we affirm the judgment as to Lucas but reverse and remand as to Staton.

On August 10, 1971, Pistolesi, a hitch-hiker, was riding in the back seat of a Volkswagen owned by Lucas and driven by Lilly Marlene Ellis. After about half an hour Ellis stopped the vehicle at a gasoline station and Lucas took over the driving. She drove south on U. S. Route 13 to Accomack County, Virginia, where her vehicle collided with a vehicle driven by Joe Staton.

The collision occurred at the intersection of U. S. Route 13 and Virginia State Route 648. Route 13 is a four-lane divided highway with a median strip separating the northbound and southbound lanes. Staton was proceeding west on Route 648 and had crossed the northbound lanes of Route 13. He testified that he stopped in the median and looked north for oncoming traffic before entering the southbound lanes but that he did not see the Lucas vehicle approaching from the north. When Staton had proceeded approximately twenty feet into the southbound lanes the right front of his vehicle was struck by the front of the Lucas vehicle.

The collision occurred in the country on a clear day during daylight hours. Staton had an unobstructed view to the north for over half a mile from the point where he drove into the southbound lanes. There were no traffic signs or signals at the median regulating traffic entering or crossing the southbound lanes from Route 648.

It is undisputed that the defendant Staton stopped his vehicle at the stop sign located at the junction of Route 648 and the northbound lanes of Route 13. He then proceeded across the northbound lanes and entered the median, forty-eight feet wide, which separated the northbound and southbound lanes of Route 13. The trial court instructed the jury that Staton had a duty to yield the right-of-way to vehicles traveling south on Route 13 but that a vehicle traveling on Route 13 "at an unlawful speed shall forfeit any right-of-way it might otherwise have." Pistolesi complains that the instruction was erroneous and that under no circumstances would a vehicle proceeding on Route 13 forfeit its right-of-way.

Under Virginia law "[w]here a highway includes two roadways thirty feet or more apart, then every crossing of each roadway of such divided highway by an intersecting highway shall be regarded as a separate intersection . . . ." Virginia Code Annotated § 46.1–1(11)(b) (1972 Replacement Volume). Thus, the intersection of Route 648 and the southbound lanes of Route 13 constitutes a separate, unmarked intersection not controlled by the stop sign located at the intersection of Route 648 and the northbound lanes of Route 13.

The "general rule" in Virginia regulating unmarked intersections is that "when two vehicles approach or enter an intersection at approximately the same time, the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right. . . ." Virginia Code Annotated § 46.1–221 (1972 Replacement Volume). Two exceptions to this rule are provided: (1) one entering a public road from a private road or driveway must stop and yield the right-of-way [Virginia Code Annotated § 46.-1–223 (1972 Replacement Volume)]; and (2) one "entering a highway, which is improved and hard surfaced and is a part of the State Highway System, from the side thereof, shall, immediately before entering such highway, stop. . . ." [Virginia Code Annotated § 46.1–247 (1972 Replacement Volume)].

The Lucas vehicle in which Pistolesi was riding was on the right of the Staton vehicle. Under any of the provisions noted above, Staton had a duty to yield the right-of-way to vehicles proceeding south on Route 13. However, unlike § 46.1–223 or § 46.1–247 there is a further provision in § 46.1–221 which states: "The driver of any vehicle traveling at an unlawful speed shall forfeit any right-of-way which he might otherwise have hereunder." The jurors were told that the Lucas vehicle would be considered as having forfeited its right-of-way if the jury found from the evidence

that Lucas was traveling at an unlawful rate of speed at the time of the accident.

Pistolesi contends that § 46.1–247 controls and that it was error to tell the jury that Lucas might have forfeited her right-of-way. "Forfeiture of right of way because of speed does not occur in any case not arising under Section 46.1–221. . . ." Atwell v. Watson, 204 Va. 624, 630, 133 S.E.2d 552, 557 (1963).

▆▆▆ Under Virginia law the mere fact that Route 13 served as a main artery for traffic does not give vehicles on that highway the right-of-way over vehicles entering from the side. King v. Eccles, 209 Va. 726, 167 S.E.2d 349 (1969). "In the absence of such an exception in the statute, there is no warrant for a favoring of the more important road over a less important road." *Id.* at 351. This would indicate that § 46.1–247 is *not* intended to require a vehicle entering a traffic artery from a less heavily traveled road to stop and yield the right-of-way. Thus, § 46.1–221 sets forth the rule controlling the right-of-way where two improved, hard surfaced roads constituting a part of the State Highway System intersect. The two exceptions to that rule, §§ 46.1–223 and 46.1–247, relate to the intersection of an improved hard surfaced road which is a part of the State Highway System and (1) "a private road, driveway, [or] alley" and (2) any unimproved, unpaved road which is not a part of the State Highway System, respectively.

▆▆▆ It was undisputed at trial that Routes 13 and 648 were both improved, hard surfaced, and a part of the State Highway System. Hence, the general rule applies and it was the duty of the Staton vehicle, the vehicle on the left, to yield; the Lucas vehicle had the right-of-way subject to forfeiture thereof if the jury found that it was traveling at an unlawful rate of speed. We perceive no error in the court's instruction on this issue.

Pistolesi contends that the trial court erred in failing to rule that Staton was negligent as a matter of law for entering into the path of an approaching vehicle which Staton failed to see although he had an unobstructed view of this vehicle. Virginia case law supports plaintiff's contention. Viewing the facts in the light most favorable to Staton, we conclude that the court below should have ruled that Staton was negligent as a matter of law.

Staton's vehicle had crossed the median strip between the northbound and southbound lanes of Route 13 and stopped at the intersection of 648 and the southbound lanes of Route 13, an intersection uncontrolled by any traffic signs. From this point Staton intended to cross the southbound lanes of Route 13 and continue west on Route 648 toward Tasley, Virginia. Staton pulled away from the median strip and into the path of the Lucas vehicle which was approaching from Staton's right on Route 13.

▆▆▆ Upon reaching an uncontrolled intersection with another highway, a driver has a duty to look for approaching traffic with reasonable care under all the *surrounding circumstances.* Caldwell v. Parker, 191 Va. 471, 62 S.E.2d 34 (1950); Angell v. McDaniel, 165 Va. 1, 181 S.E. 370 (1935). Thus, if the intersection is in a populated community and the speed limit is reduced, the duty to look may be discharged by observing traffic within a relatively short distance. If the intersection is in open country, where the view is unobstructed for greater distances and speed limits are much higher, the duty to look effectively may demand that the driver of the burdened vehicle observe the traffic approaching from a greater distance.[1]

---

I. This view is supported by a careful reading of the case of Angell v. McDaniel, 165 Va. 1, 181 S.E. 370 (1935). Staton relies on that case, citing it as a "landmark" decision which, he claims, is almost factually identical to the instant case. Yet the court in *Angell* stated: "The plaintiff in error relies upon John-

■■ It is important to note, however, that if the favored oncoming vehicle is in such plain view that the driver of the burdened vehicle, looking with reasonable care, was bound to have seen it, then there is an *absolute duty* to see it. Von Roy v. Whitescarver, 197 Va. 384, 89 S.E.2d 346 (1955); Perry v. Thompson, 196 Va. 817, 86 S.E.2d 35 (1955); Oliver v. Forsyth, 190 Va. 710, 58 S.E.2d 49 (1950). Testimony indicates that Staton had a clear, unobstructed view of from one-half to one mile northerly from the intersection up Route 13 in the direction from which the Lucas vehicle was approaching. As stated, it was a clear day, the sun was shining and there were no obstacles to block his view. Under the surrounding circumstances (an intersection in the open country with a highway having a posted speed limit of sixty miles per hour and an unobstructed view of over 2,640 feet) Staton had an *absolute duty to see the oncoming Lucas vehicle.*

■ Staton claims, and Pistolesi testified, that the Lucas vehicle may have been traveling at a speed of seventy to seventy-five miles per hour. This would not excuse Staton's failure to observe the automobile. Excessive speed does not establish a reasonably satisfactory explanation as to why a driver did not see an oncoming vehicle. City Cabs, Inc., v. Griffith, 194 Va. 818, 75 S.E.2d 487 (1953). It is incredible that the speed of a vehicle was such as to make it invisible to a person keeping a lookout, regardless of its rate of travel. Nehi Bottling Co. v. Lambert, 196 Va. 949, 86 S.E.2d 156 (1955).

■ Additionally, Staton claims he discharged any duty he may have had because he in fact did look for oncoming traffic. The driver of a burdened vehicle who keeps a lookout and fails to heed what he sees or should see is as guilty of negligence as one who fails to keep a lookout. Nehi Bottling Co. v. Lambert, *supra;* Yellow Cab Co. v. Eden, 178 Va. 325, 16 S.E.2d 625 (1941). Having looked, he must then determine whether it is safe to proceed. When he intends to enter and cross an intersection the right to do so is to be tested by whether a person of ordinary prudence would attempt it. Von Roy v. Whitescarver, *supra;* Rhoades v. Meadows, 189 Va. 558, 54 S.E.2d 123 (1949). Staton, before proceeding into the intersection had the duty to await the passage of oncoming vehicles that were approaching from his right so near or at such a rate of speed that a person exercising ordinary care for his own safety would reasonably conclude that it was not safe to cross. Oliver v. Forsyth, *supra;* Core v. Wilhelm, 124 Va. 150, 98 S.E. 27 (1919).

In the case of Von Roy v. Whitescarver, Justice Spratley summarized the law in this area by stating:

"The duty of looking is based on the wisdom of seeing whether traffic is approaching, where and at what speed. If looking discloses approaching traffic, then the right to proceed is to be tested by whether a person of ordinary prudence would attempt it. . . . *But if a person having a duty to look 'carelessly undertakes to cross without looking, or, if looking, fails to see or heed traffic that is ob-*

---

son v. Harrison, 161 Va. 804, 172 S.E. 259; but that case is distinguishable. There the automobiles were being driven on highways in the country. The drivers could see each other as they approached across the field, which was level, for at least one-tenth of a mile before they reached the intersection. In the present case the collision occurred at the intersection of streets in the city. The distance from which the driver of one car could have seen the other car was not nearly so great . . . in the Johnson Case [country highway] the plaintiff did not look within a reasonable distance from the intersection." *Id.* at 372.

Thus, what is a reasonable distance varies between city and country and clearly *Angell* which involved an in-town collision, is distinguishable from the case at bar, a country intersection collision.

vious and in dangerous proximity and continues on into its path, he is guilty of negligence as a matter of law.'" Von Roy v. Whitescarver, 197 Va. 384, 89 S.E.2d 346, 352 (1955). (Citations omitted.)

Taking the view of the facts and circumstances most favorable to defendant Staton, it is evident that he had an unobstructed, plain view of Route 13 to his right for at least 2,640 feet. He was attempting to cross the two southbound lanes of Route 13, which had a combined width of twenty-four feet. The testimony indicates that Staton had pulled from the safety of the median strip on to Route 13 and accelerated to a speed of fifteen miles per hour. Continuing to view the facts in the light most favorable to Staton, we will assume he averaged at least seven miles per hour during this period of acceleration; although there was some conflict in the testimony as to exactly where the impact occurred we will accept the investigating officer's testimony that the accident occurred in the right hand, southbound lane of Route 13, approximately twenty feet from the median strip where Staton pulled out. At an average speed of seven miles per hour, Staton should have covered the twenty feet to the point of impact in two seconds. This time factor would appear to agree with Staton's own testimony that he was hit just as he started to pull away "from the center."

There was conflicting testimony as to the speed of the Lucas vehicle. Pistolesi claims it was traveling as fast as seventy-five miles per hour. Another eyewitness claims it appeared to have been going only fifty-five miles per hour. If we assume it was traveling at seventy-five miles per hour, in the two seconds it took Staton to travel twenty feet the Lucas car would have traveled 220 feet. Indeed, a car some 220 feet away on a high-speed open highway is in very dangerous proximity. The Lucas vehicle would have traversed this distance in two seconds at a speed of seventy-five miles per hour; at the lawful speed of sixty miles per hour it would have covered that distance in only 2.5 seconds. Again that is in dangerous proximity to the intersection. In fact, at any speed less than seventy-five miles per hour the Lucas vehicle must necessarily have been closer than 220 feet for the accident to have occurred. Based on the physical facts, reasonable men could not disagree that the Lucas vehicle was dangerously close when Staton entered the highway.

Pistolesi testified that he saw Staton entering the highway when the Lucas vehicle was some two hundred meters or 650 feet away from the intersection. It would appear that the validity of this estimate is highly questionable. If his estimate of both speed and distance is accepted as correct, the Lucas vehicle would have required only six seconds to reach the intersection. Since Staton was moving at least at an average of ten feet per second (seven miles per hour), he should have traveled sixty feet in six seconds. That would put him completely through the intersection and thirty-six feet beyond on Route 648 when the Lucas vehicle reached the intersection. If Staton entered the intersection when the approaching Lucas car was 650 feet away and traveled only twenty feet, he must have illegally stopped on the highway or he was proceeding in a negligent manner. None of the testimony will support either conclusion. The physical facts relied on are such as to render the estimate improbable.

In sum, we conclude that the physical facts were such that reasonable men could draw no other inference or conclusion than that Staton had an absolute duty to see what was in plain view; that he failed to see or heed traffic that was obvious and in dangerous proximity; and that he proceeded into its path. Thus Staton was guilty of negligence as a matter of law, and the jury should have been so instructed.

We find no merit in Pistolesi's contention that the instruction to the jury on the issue of contributory negligence was improper. The instruction as given follows substantially the language used by the Supreme Court of Appeals of Virginia in Steele v. Crocker, 191 Va. 873, 62 S.E.2d 850 (1951). The jury could properly find that Pistolesi was contributorily negligent if he failed to warn Lucas of imminent danger after he (1) perceived the danger, *and* (2) became aware that Lucas, the driver of the car in which he was riding, was taking no action to avoid the danger. Linton v. Virginia Electric & Power Co., 162 Va. 711, 174 S.E. 667 (1934).

Whether Pistolesi had sufficient time to effectively warn the driver after perceiving the danger was a question for the jury. Atlantic Coast Line R. Co. v. Withers, 192 Va. 493, 509, 65 S.E.2d 654, 662 (1951). Furthermore, it was the duty of the jury to determine whether Pistolesi was timely aware that Lucas was doing nothing to avoid the danger (*i. e.*, that the driver was "apparently unconscious" of the danger). Bernard v. Bohanan, 203 Va. 372, 377, 124 S.E.2d 191, 195 (1962); Remine v. Whited, 180 Va. 1, 21 S.E.2d 743 (1942).

This defense of contributory negligence could properly be asserted by both the host-driver, Lucas, Mize v. Gardner Motor Co., 166 Va. 415, 186 S.E. 108 (1936), and a third party, Staton, Linton v. Virginia Electric & Power Co., *supra.*

Having found no error with respect to the issue of negligence on the part of Carrol Lucas we affirm the judgment as to her. Because of the error of the court in failing to hold as a matter of law that Joe Staton was guilty of negligence we must reverse the judgment as to him and remand for a new trial on the merits.

Affirmed in part and reversed in part.